IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORA A. MORTON, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:12-CV-01738 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Brann) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## Introduction

Plaintiff Debora A. Morton has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Morton's claims for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  Morton met the insured

status requirements of the Social Security Act through December 31, 2012.  Tr. 621, 739.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Morton protectively filed her applications for social security disability insurance benefits and supplemental security income benefits on March 10, 2010.  Tr. 621.  Morton claims that she became disabled on October 8, 2008.  Tr. 623.  Morton has been diagnosed with numerous impairments, including major depressive disorder, generalized anxiety disorder, status post right breast carcinoma, a "thyroid problem," left sacrolitis and lumber facet anthropathy, lumber radiculopathy/degenerative disc disease, cardiac issues and prior myocardial infarctions, and drug dependence, in remission.  Tr. 623-25.  On August 3, 2010, Morton's applications were initially denied by the Bureau of Disability Determination.  Tr. 723.

On September 2, 2010, Morton requested a hearing before an administrative law judge ("ALJ").  Tr. 730.  The ALJ conducted a hearing on July 7, 2011, where

_____

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

Morton was represented by counsel.  Tr. 639-94.    On September 20, 2011, the

ALJ issued a decision denying Morton's applications.  Tr. 621-32.  On July 11,

2012, the Appeals Council declined to grant review.  Tr. 1.  Morton filed a

complaint before this Court on August 31, 2012.   Supporting and opposing briefs

were submitted and this case became ripe for disposition on March 15, 2013, when

Morton filed a reply brief.

Morton appeals the ALJ's determination on three grounds: (1) the ALJ erred

in substituting his lay opinion for that of the vocational expert, (2) the ALJ erred in

failing to include Morton's mental limitations in the residual functional capacity

assessment, and (3) the ALJ did not fully consider and/or properly credit all of the

relevant medical evidence.[2]

For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Morton is 57 years of age, has obtained an associate's degree in nursing, and

is able to read, write, speak, and understand the English language. Tr.  760, 766,

924.  Morton has past relevant work as a nurse, which is classified as medium,

skilled work, although as performed by Morton it was heavy work.  Tr. 686.

### A.    Morton's Mental Impairments

---

[2] Morton presents this argument as a failure by the ALJ to properly credit Morton's treating physician opinion.  However, the actual argument within Morton's brief makes it clear that she is arguing that the ALJ did not properly consider certain evidence.  This is reinforced by the fact that neither of Morton's treating physicians offered an opinion as to her functional limitations.

Morton has suffered from depression "since her 20's;" however, the first treatment notes contained within the administrative record begin on February 6, 2009 at her first session with Ulla Martz, LCSW.  Tr. 906, 921.  Morton reported multiple symptoms accompanying her anxiety and depression, including: significant appetite or weight change, insomnia, social isolation, irritability, fatigue, restlessness, difficulty concentrating, and difficulty controlling her anxiety and worry.  Tr. 921.  Ms. Martz noted that Morton's appearance was unremarkable, she was alert and oriented in all spheres, had fair eye contact, an intense affect, and an irritable, depressed, and anxious mood.  Id.  Ms. Martz also observed that Morton's motor activity and perception were within normal limits. Id.  Morton's speech was normal, her language was intact, her associations were logical, her memory was intact, and her insight and judgment were good.  Id. However, Ms. Martz noted that Morton displayed fearfulness, hopelessness, anhedonia, and suffered from poor concentration.  Id.

At this appointment, Morton stated that she had a "good" response to her medications, including Prozac and Wellbutrin. Tr. 923.  Finally, Ms. Martz noted that Morton complained that her family stress and cancer treatments were limiting what she and her husband were "able to do and enjoy."  Tr. 925.

At a March 3, 2009 appointment, Morton reiterated her symptoms of anxiety and depression, and noted that her high level of family stress continued.  Tr. 920.

4

Ms. Martz noted that Morton was appropriately dressed, was adequately groomed, and was cooperative.  Id.  Additionally, her perception, insight, cognition, and memory were within normal limits; although Morton's mood was anxious and her thought process was "distractible," her affect was appropriate to content.  Id. Morton denied suicidal or homicidal ideations.  Id.  A follow-up appointment with Ms. Martz on March 17, 2009 revealed almost identical symptoms and mental status findings.  Tr. 917.

On April 17, 2009, Morton had an initial intake session with Shanthi Lewis, MD for treatment of her mental impairments.  Tr. 1542.  Morton presented with complaints of fatigue, decreased appetite, poor sleep, amotivation, increased guilt, increased self-blame, and feelings of hopelessness.  Id.  Morton reported that while her anxiety had "always been high," she had only one previous panic attack.  Id. Dr. Lewis noted that Morton had a history of suicidal ideations, and described a previous overdose of Xanax as a suicide attempt.  Id.  Dr. Lewis observed that Morton had good eye contact, was cooperative, had fluent and coherent speech, had an organized and linear thought process, and had intact associations and calculations.  Tr. 1543.  However, Morton also had a depressed mood and constricted affect.  Id.

Dr. Lewis conducted several objective tests at this appointment, and noted that Morton was alert and oriented, had intact attention and concentration, could

recall three out of three words immediately and two out of three words after five

minutes, and had intact memory.  Tr. 1544.  Dr. Lewis diagnosed Morton with

generalized anxiety disorder and major depressive disorder; he assigned Morton a

GAF score of 51-60.[3]

On May 1, 2009, Morton again presented to Dr. Lewis with anxiety,

insomnia, and fatigue.  Tr. 954.  Morton reported diminished interest and pleasure,

a diminished ability to think and concentrate, fatigue, indecisiveness, excessive

guilt, decreased motivation, and restlessness.  Id.  Dr. Lewis observed that Morton

was casually dressed, cooperative, had appropriate behavior, was anxious with a

flat affect, and had impaired recent memory and diminished attention.  Id.

However, Dr. Lewis believed that her insight, perception, and judgment were

within normal limits.  Id.  Dr. Lewis made similar observations at Morton's May

29, 2009 and June 26, 2009 appointments, although in June Morton reported

"panic symptoms" for the first time.  Tr. 950, 952.

On July 10, 2009, Morton returned to Ms. Martz with complaints of anxiety

and depression.  Tr. 914.  Morton reported that she had significant family stress

since she and her husband were caring for their grandson.  Id.  She also stated that

she was unable to find a job, but discussed broadening her job search.  Id.  Seven

---

[3]  A GAF score between 51 and 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

days later, Morton reported to Dr. Lewis that she experienced a decrease in anxiety

after discontinuing Chantix, and stated that she felt "much calmer." Tr. 948.

On August 14, 2009, Dr. Lewis described Morton as cooperative with

normal perception and appropriate behavior. Tr. 946. However, Dr. Lewis noted

that Morton had impaired recent memory, a constricted affect, diminished

attention, and limited insight and judgment. Id. At an appointment on August 28,

2009, Dr. Lewis' observations were essentially unchanged. Tr. 944. On that day,

Morton also presented to Ms. Martz; Ms. Martz's mental status findings were

substantially similar to those of Dr. Lewis. Tr. 912. Morton also reported to Ms.

Martz that, while she still did not have a job, she had a second interview scheduled

for the next week. Id.

Morton's symptoms and mental status examinations remained essentially

unchanged throughout the rest of 2009; she continued reporting depression,

anxiety, and panic attacks. Tr. 194, 938, 940. Mental status examinations

continually revealed impaired recent memory, limited insight and judgment, and a

constricted affect. Id. In October 2009, Morton reported that she had interviewed

for a nursing job, but in November 20069 she reported that she could not find

nursing work because her license was on probation. Tr. 938, 940.

In 2010, Morton noted an improvement in her symptoms. In January 2010,

Morton was still reporting anxiety and panic attacks to Dr. Lewis. Tr. 936. While

Dr. Lewis noted that Morton's recent memory was still impaired, he observed that Morton's thought, perception, and attention was within normal limits.  Id.  At a January appointment with Ms. Martz, Morton reported anxiety and panic; however, her perception, cognition, and memory were all within normal limits.  Tr. 906.

On February 5, 2010, Morton reported to Dr. Lewis that her anxiety was still present, especially in light of her daughter's cancer treatment.  Tr. 934.  However, Morton reported that she planned to take a nursing refresher court "in order to find a job in a supervised setting."  Id.  Morton still suffered from impaired recent memory and limited insight and judgment, but Dr. Lewis found that her attention, thoughts, and perception were within normal limits.  Id.  Dr. Lewis also noted an overall improvement in symptom reduction.  Tr. 935.  On April 15, 2010, Dr. Lewis for the first time noted that Morton's memory was within normal limits, and no longer felt that her recent memory was impaired.  Tr. 1518.  Dr. Lewis also observed that Morton's thought, perception, insight, judgment, cognition, and attention levels were within normal limits.  Id.  At this appointment, Morton stated that she had been working in home care until the previous week when the patient she had attended died.  Id.

On May 27, 2010, Dr. Lewis noted that Morton was "doing well on medication."  Tr. 1516.  He also noted an overall improvement in symptom reduction.  Tr. 1517.  Dr. Lewis stated that Morton's thoughts, perception, insight,

judgment, cognition, and attention were within normal limits.  Tr. 1516.  He also observed Morton to be cooperative with appropriate behavior; he found her affect to be constricted, but noted that Morton's mood was euthymic.  Id.

On July 9, 2010, Dr. Lewis again observed that Morton's thoughts, perception, memory, and cognition were within normal limits.  Tr. 1514.  Dr. Lewis did note a decline in Morton's overall mental wellbeing; he stated that Morton "had done well on current meds until past month. Now reports one month of worsening depression, low energy, [and] low motivation."  Id.  He also observed that Morton had a blunted affect and only fair insight and judgment.  Id.  However, Dr. Lewis did not believe this decline was a serious issue; he noted that Morton's increased symptoms coincided with erratic Thyroid-stimulating hormones.  Tr. 1515.  Dr. Lewis opined that as those hormones stabilized, Morton's mood should improve.  Id.

Morton's final appointment with Dr. Lewis occurred on September 27, 2010, where Morton reported a depressed mood, diminished interest or pleasure, and decreased motivation.  Tr. 1512.  Dr. Lewis found that Morton had fair insight and a depressed mood with an appropriate affect.  Id.  However, he also found that Morton's thoughts, perception, judgment, cognition, and memory were all within normal limits.  Id.  Morton reported that she was returning to work as a medical

records reviewer and was "looking forward to it as [she] fe[lt] it [would] give her structure and direction." Id.

On March 29, 2011, Morton presented to Douglas Nathanson, MD of the Geisinger Specialty Clinic for a neurological consultation. Tr. 1554. Dr. Nathanson found that Morton had an appropriate affect, and intact memory, attention span, concentration, and knowledge. Tr. 1557. Dr. Nathanson performed several objective tests, and found that Morton was able to do calculations and recite the months of the year backwards; she also had four out of four recall after five minutes. Id.

Morton's last appointment with Ms. Martz prior to the administrative hearing occurred on June 28, 2011. Tr. 1551. Morton complained of a depressed mood and diminished interest or pleasure. Tr. 1552. She also complained of crying spells, irritability, fatigue, and decreased motivation. Id. Morton also reported that she experience anxiety; accompanying the anxiety was fatigue, difficulty controlling her worrying, difficulty concentrating, irritability, and sleep disturbance. Id. Ms. Martz assigned Morton a GAF score of 60. Id.

## B.   Residual Functional Capacity Assessments

On July 13, 2010, Morton was examined by a state agency consultant, Sara Camaerei, PsyD. Tr. 1099. Dr. Camaerei opined that Morton had slight restrictions in her ability to understand, remember, and carry out short, simple

instructions.  Id.  Dr. Camaerei also believed that Morton was moderately impaired in her ability to: (1) understand, remember, and carry out detailed instructions, (2) make judgment on simple work-related decisions, (3) respond appropriately to work pressures in a usual work setting, and (4) respond appropriately to changes in a routine work setting.  Id.

In support of this assessment, Dr. Camaerei noted that Morton arrived alone and on time to the appointment.  Tr. 1102.  Morton was appropriately dressed and groomed, and had good hygiene.  Id.  Dr. Camaerei observed that Morton had a flat affect and dysphoric mood, but found that Morton had relevant and goal-direct thoughts, as well as good attention and concentration.  Id.  Dr. Camaerei noted that Morton complained of, among other things: sadness, crying, lethargy, loss of interest, diminished attention and focus, excessive worrying, and panic attacks.  Id. Dr. Camaerei assigned Morton a GAF score of 50.

On August 2, 2010, another state agency consultant, Grant Croyle, Ph.D., reviewed Morton's files to create a residual functional capacity assessment.  Tr. 1373.  Dr. Croyle believe that Morton was moderately limited in her ability to: (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) complete a normal workday/week without interruptions and perform at a consistent pace without an unreasonable number and length of rest periods,

and (4) respond appropriately to changes in the work setting.  Tr. 1373-74.

Otherwise, Dr. Croyle felt Morton was not significantly limited in any way,

including in her abilities of understanding and remembering.  Id.

Despite these limitations, Dr. Croyle opined that Morton could "make

simple decisions," and "sustain an ordinary routine without special supervision."

Tr. 1375.  Dr. Croyle reiterated that there were no restrictions in Morton's

memory, social interaction, or understanding.  Id.  Ultimately, Dr. Croyle

concluded that Morton was "able to meet the basic mental demand of competitive

work on a sustained basis despite the limitations resulting from her impairments."

Id.

### C.      The Administrative Hearing

On July 7, 2011, Morton's administrative hearing was conducted.  Tr. 639-

94.  At that hearing Morton testified that her main issues were her depression and

anxiety.  Tr. 645.  Morton testified that her medication was not entirely effective at

treating her anxiety and depression; on a scale from zero to ten, with ten being

completely effective, Morton rated the effectiveness of her medication as a three to

four.  Tr. 650.  Morton stated that she had many stressors in her life, including

caring for her deaf four year old grandson; this included preparing his food,

changing his diapers, and getting him ready for school.  Tr. 654-56.  When her

grandson was away at school, Morton generally kept herself busy with cleaning,

cooking, watching television, and grocery shopping "a couple of times" each week. Tr. 657-60.  Morton testified that she did have some trouble vacuuming and did not wash windows, although she did take out the garbage.  Tr. 660-61.

When examined by her attorney, Morton also stated that she had issues sleeping, which resulted in memory issues, including not being "as quick or sharp" as she had been before.  Tr. 672.  Morton also testified that she had "[m]aybe about four" panic attacks each month.  Tr. 673.  Morton stated that she saw her psychologist once every three weeks, and saw her psychiatrist once every six weeks.  Tr. 675-76.

After Morton testified, Dr. Paul Dotty, an impartial vocational expert, was called to give testimony.  Tr. 685.  The ALJ asked Dr. Dotty to assume a hypothetical individual with Morton's age, education, and work experience who was limited to medium work[4] but could not climb ladders, scaffolds, or ropes except in emergencies, and could only occasionally use ramps or stairs.  Tr. 686-87.  Furthermore, the hypothetical individual could not work at unprotected heights

---

[4] Medium Work is defined by the regulations of the Social Security Administration as work that involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do ... light work." 20 C.F.R. § 404.1567. Light work is less demanding. Light work is defined as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  Id.

or in settings where there would be dangerous, moving machinery or persistent industrial noise with a high decimal level.  Tr. 687.  The ALJ further proposed that this hypothetical individual could not perform work that involved highly complex and detailed work processes, although moderate complexity would be appropriate. Id.  Additionally, this individual could perform work "within a quota system work pace," under normal supervision, and could not work under a strictly scrutinized or "highly intrusive" supervisory dynamic.  Id.  Finally, the ALJ mandated at most moderate interaction with co-workers, and only occasional contact with members of the public.[5]  Id.

Under this hypothetical, Dr. Dotty testified that the individual would not be able to perform Morton's past relevant work.  Id.  However, the individual would be able to perform work as a patient transporter, a dining room attendant, or an assembler.  Tr. 688.  These positions were all unskilled, did not require complex work processes, and excluded "customer-service type" activities.  Tr. 688-89.  On cross-examination, Dr. Dotty stated that "assuming the hypothetical individual" missed four days of work in a typical month, that individual would be unemployable.  Tr. 692.

## Discussion

---

[5] The ALJ defined occasional contact as "occasional customer service type of work.  But not a sustained, persistent frequent type of dynamic."  Id.  The ALJ stated that there could be frequent contact if the contact were "pointing them to . . . where [a bathroom] might be located in a facility or that kind of thing," however, Morton could not frequently "engage in a rather involved back and forth dynamic . . ."  Tr. 688.

14

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058,

1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain

evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity, (2) has an impairment that is severe or a combination

of impairments that is severe, (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment, (4) has

the residual functional capacity to return to his or her past work and (5) if not,

whether he or she can perform other work in the national economy. See 20 C.F.R.

§ 404.1520.   The initial burden to prove disability and inability to engage in past

relevant work rests on the claimant; if the claimant meets this burden, the burden

then shifts to the Commissioner to show that a job or jobs exist in the national

economy that a person with the claimant's abilities, age, education, and work

experience can perform.  Mason, 994 F.2d at 1064.

16

A.    The ALJ's Use of the Vocational Expert's Testimony

Morton first challenges the ALJ's conclusion that she could perform work that exists in significant numbers in the national economy; Morton contends that the vocational expert, Dr. Dotty, testified that Morton could not engage in any work whatsoever.  Morton argues that the ALJ ignored Dr. Dotty's testimony, and substituted his own lay opinion in the place of Dr. Dotty's testimony.

Contrary to Morton's contention, Dr. Dotty did not testify that Morton was unemployable.  Rather, Dr. Dotty stated that, if Morton's assertion that she would be absent for four days per month on a regular basis were true, she would be unemployable.  Tr. 692.  However, the ALJ did not accept Morton's testimony as true.  While the ALJ acknowledged that Morton claimed she had "maybe" four panic attacks per month, the ALJ found that Morton's alleged "symptoms [were] disproportionate to the objective findings."  Tr. 628-29.  In reaching this conclusion, the ALJ cited to generally normal mental examinations, Morton's GAF score of 51-60, and reports of decreased anxiety in July of 2009.  Tr. 629.  The ALJ also found Morton less than credible, in part because she had been actively searching for work during the time when she claimed she was disabled, and in part based on an incident where she had taken a Percocet that she was not supposed to take.  Tr. 629-30.  After Morton had taken the Percocet, she was given a random

drug test by her employer, and asked Dr. Lewis to write a note to "cover this," which Dr. Lewis refused to do.[6]  Tr. 630, 1116.

Consequently, it is clear that the ALJ was not rejecting Dr. Dotty's testimony that a person who missed four days per month would be unemployable. Rather, the ALJ was rejecting Morton's testimony that she would miss four days per month because of panic attacks.[7]  As such, the ALJ neither disregarded the vocational expert's testimony, nor did the ALJ engage in a lay analysis that would have compromised his ultimate conclusions.

### B.    Inclusion of Mental Impairments in the Residual Functional Capacity Determination

Morton next argues that the ALJ did not properly account for her mental impairments in the hypothetical question presented to the vocational expert. Additionally, Morton argues the ALJ did not properly account for her advanced age in determining that she was still able to work.

Morton relies on Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), in arguing that the ALJ's hypothetical question did not properly account for Morton's mental impairments.  However, Ramirez is distinguishable from this case.  In Ramirez, the United States Court of Appeals for the Third Circuit found that

---

[6] These were adequate reasons to partially discount Morton's credibility, and the ALJ's decision to do so is supported by substantial evidence.

[7] Additionally, the administrative record does not contain any evidence relating to the severity of Morton's alleged panic attacks.  Thus, even if the ALJ had believed that Morton would have four panic attacks per month, it is not clear that these panic attacks would have actually resulted in Morton's absence from an entire day of work.

limiting the claimant to simple one and two step tasks did not adequately convey the fact that the claimant often had deficiencies in concentration, persistence, or pace. Id. at 554. Specifically, the Third Circuit stated that the limitation did "not take into account deficiencies in pace. Many employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time." Id.

In contrast, here the ALJ did account for all of the mental impairments suffered by Morton. In the hypothetical question, the ALJ limited the individual to jobs of moderate complexity with normal supervision,[8] and stated that she should not work in a strictly scrutinized or highly intrusive supervisory dynamic. Tr. 687. The ALJ also limited the hypothetical individual to moderate co-worker interaction and only occasional contact with the public. Id. Most importantly, the ALJ stated that the hypothetical individual "could perform work within a quota system work pace." Id. Not only did the ALJ's hypothetical address the issue found most significant in Ramirez, the individual's limitations in pace, but the hypothetical also encompassed all of Morton's credibly established limitations.

At step two of the sequential evaluation process, the ALJ found that Morton had moderate limitations in her persistence, concentration, or pace. Tr. 626.

_____

[8] Dr. Dotty limited all work examples to unskilled positions because of this limitation. Tr. 688-89.

19

However, the ALJ elaborated that the residual functional capacity determination required a more detailed assessment of mental impairments, and therefore would reflect the degree of limitations in concentration, persistence, or pace in more specificity.  Tr. 627.  In crafting a residual functional capacity determination, the ALJ noted that Morton's activities of daily living included: caring for her deaf grandson, preparing meals for her grandson and husband, performing household tasks, and grocery shopping a few times a week.  Tr. 628.  The ALJ also considered the medical evidence, including: Morton's GAF scores indicating borderline moderate to mild symptoms, generally normal perception, cognition, and memory, no reports of suicidal or homicidal ideations, and no attention problems.  Tr. 629.

The ALJ also relied heavily on the opinions of Drs. Croyle[9] and Dr. Camaerei, the only two doctors who offered an opinion regarding Morton's work limitations caused by her mental impairments.  Tr. 630.  Dr. Camaerei opined that Morton was moderately limited in her ability to understand, remember, and carry out detailed instructions, as well as her ability to make judgments on simple work-related decisions.  Tr. 1099.

---

[9] Morton contends that Dr. Croyle's credibility was compromised by the fact that "the only evidence reviewed by Dr. Croyle is the report of Dr. Camaerei . . ."  However, Dr. Croyle cited to at least some of the evidence he considered in reaching his conclusions; this evidence included, inter alia, the medical reports and notes of Dr. Lewis.  Tr. 1388.

Dr. Croyle concluded that Morton had moderate difficulties in maintaining concentration, persistence, or pace. Tr. 1386. Dr. Croyle elaborated that Morton was moderately limited only in her ability to: (1) maintain attention and concentration for extended periods of time, (2) complete a normal workday/week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and (3) to be punctual within customary tolerances and perform activities within a schedule. Tr. 1373. However, Dr. Croyle also stated that, despite these limitations, Morton could make simple decisions and "sustain an ordinary routine without special supervision." Tr. 1375. Dr. Croyle concluded that Morton was "able to meet the basic mental demands of competitive work on a sustained basis . . ." Id.

Consequently, the ALJ presented all of Morton's credibly established limitations to the vocational expert. Specifically, the ALJ accounted for Morton's limitations in attention and concentration by limiting her to jobs with moderate complexity and no highly detailed or complex work processes. Tr. 627. The ALJ addressed Morton's difficulties in pace and schedule by limiting the amount of supervision she could endure and addressing the type of pace Morton was capable of sustaining. Id. The ALJ also addressed Morton's anxiety issues and panic attacks, issues that tended to occur around groups of people and strangers, by

limiting Morton's contact with co-workers and the public.  Id.  Consequently,

Ramirez is not applicable, and the ALJ did not err in the hypothetical presented to

the vocational expert.

Morton's argument that her status as an individual of "advanced age" would

direct a finding of disabled is likewise without merit.  As an initial matter, while

Morton argues that the Commissioner attempts to categorize her based on her age

at application, the ALJ did note Morton was of advanced age at the time of the

ALJ's decision.  Tr. 630.  The ALJ further concluded that transferability of job

skills was not material to the determination of disability because Morton was not

disabled regardless of the transferability of job skills.  Tr. 631.  The ALJ did not err

in this finding.  Pursuant to Social Security Administration's Medical-Vocation

Rules, Morton, as a woman of advanced age, would be found not disabled even if

she did not possess transferable job skills.[10]  20 C.F.R. pt. 404, subpt. P, app. 2,

Rules 203.15, 203.22.

### C.    ALJ's Consideration of the Relevant Evidence

Morton's final argument is that the ALJ failed to consider relevant evidence,

or did not give full credit to such evidence.  Specifically, Morton cites to her panic

attacks, and her diagnoses of major depressive disorder and generalized anxiety

---

[10] Consequently, even if the ALJ had used an incorrect age classification, it would not have
affected the outcome of the case.  Thus, even assuming the ALJ had erred here, it would have
constituted harmless error.

disorder.  She also references a "history of suicidal ideations," one past suicide attempt, sleep difficulties, and memory problems. Morton also alleges that the ALJ did not consider her cardiac issues and back issues.

The ALJ did consider all of the evidence cited by Morton.  Regarding Morton's cardiac and back issues, the ALJ considered both issues at step two of the sequential evaluation process when he found that neither impairment was severe. Tr. 624.  The ALJ also clearly and specifically accounted for Morton's back issues in the residual functional capacity assessment at step four when he limited Morton to medium work; this was done based on solely on Morton's testimony that her back doctor had limited her to lifting twenty-five to fifty pounds.  Tr. 627, 665. The ALJ also referenced Dr. Lewis' notation that Morton had attempted suicide once before.  Tr. 628.[11]  However, the ALJ noted that Morton herself contradicted this when she stated that the "suicide attempt" was an accidental overdose caused by losing track of how much Xanax she had taken.  Tr. 678-79.[12]

The ALJ also considered the appointment notes and treatment records provided by Dr. Lewis and Ms. Martz. Tr. 629-30.  The ALJ discussed several of Morton's appointments with Ms. Martz; he noted that in January of 2010, Ms. Martz noted that Morton's perception, cognition, and memory were within normal

---

[11] Significantly, Morton denied having suicidal or homicidal ideations at every single appointment she had with Dr. Lewis.  Tr. 920, 934-40, 944-50, 954, 1512-1518, 1542.
[12] At the administrative hearing, the ALJ asked Morton: "I mean, let's speak plainly. Was it a suicide attempt?" Morton replied "No."  Tr. 679.

limits, and her affect was appropriate to content.  Tr. 629.  The ALJ noted that in

April of 2009, Dr. Lewis assigned Morton a GAF score of 51-60, and in July of

2009, Dr. Lewis noted that Chantix was effective in decreasing Morton's anxiety.

Id.  The ALJ also referenced Dr. Lewis' findings that Morton's thought processes

were relevant and goal-oriented, that she exhibited good attention and

concentration, and that she appeared to have good judgment and insight into her

difficulties.  Tr. 629-30.

To the extent that the ALJ did not find the subjective complaints contained

with the treatment notes credible, as discussed previously in subsection A, such a

decision is supported by substantial evidence.

## Conclusion

A review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.


BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: May 28, 2014

24